[Civil No. 3850. Filed December 13, 1937.]

[76 Pac. (2d) 225.]

THAD M. MOORE, FRANK LUKE and D. C. O'NEIL, as Members of and Constituting the State Tax Commission of Arizona, and FRANK E. FRASER, as Director of the Sales Tax Division of the State Tax Commission of Arizona, Appellants, v. PLEASANT HASLER CONSTRUCTION COMPANY, a Corporation, Appellee.

Mr. Joe Conway, Attorney General, Mr. W. E. Polley, His Assistant, and Mr. J. B. Sumter, of Counsel, for Appellants.

Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellee.

McALISTER, C. J.—The judgment of the trial court was reversed and appellee, the construction company, has requested a rehearing and in its motion assigns several reasons why, in its view, the court reached the wrong conclusion. Some of these present anew matters dealt with in the original opinion, but in disposing of the motion consideration will be given only to those not then presented.

One of the grounds urged by appellee in support of its motion is that it was a close doubtful question whether contractors came within the terms of the sales tax law and, this being true, the court should have applied to the facts the rules of contemporaneous practical construction and given that act the meaning those whose duty it was to administer it placed upon it for a period of over three years from the date it first became operative. Its doubtful meaning, appellee contends, in so far as contractors are concerned, is shown by these facts: First, there was a dissenting opinion by a member of this court holding that contractors are not engaged in the business of selling tangible personal property at retail; second, the decision of the trial court that contractors do not come within its terms; third, the opinion of the Attorney General of the state, the legal advisor of the tax commission, to the same effect; fourth, the words, "business of selling," as generally understood, do not include "the business of contracting," but to uphold appellants' contention of the sales tax law they must be treated as though they do; fifth, the tax commission whose duty it was to collect the tax, did not attempt to bring contractors within the act for a period of over three years after it was first enacted in June, 1933; sixth, conflicting opinions on the question in the four jurisdictions in which the matter has been considered, those in Illinois and Arkansas favoring the view that con-

tractors are engaged in the business of selling tangible personal property at retail and those in Maryland and Louisiana holding to the contrary. It should be pointed out in this connection, however, that since the rendition of the original opinion in which *Blome* v. *Ames*, 365 Ill. 456, 6 N. E. (2d) 841, 111 A. L. R. 940, was cited by us as authority, the Supreme Court of Illinois, in *Herlihy Mid-Continent Co.* v. *Nudelman, etc.*, 367 Ill. 600, 12 N. E. 638, has expressly overruled that case in so far as it holds that "construction contractors who furnish labor and material in excavating . . . or in the erection of foundations or buildings, or in the making of various kinds of structural repairs to buildings" are subject to the sales tax. Such contractors, not the Sanitary District of Chicago for whom they were building, are, within the meaning of that law, the users, not the sellers, of these materials. It may, perhaps, be true that the rule of contemporaneous practical construction should, as a result of the foregoing facts, be applied, but since my view of the matter in its present state rests upon a different proposition, I shall not undertake to say definitely whether it should be or not. The doubtful meaning of the sales tax law, however, as applied to contractors, is a material factor in bringing about the opinion I now entertain of the question whether its provisions include them.

 A reading of chapter 77, Session Laws of 1935, the sales tax law with which we are here concerned, discloses that it divides those persons upon whom the legislature imposed a sales tax into seven different classes and that it requires all those in the same class, with one exception, to pay the same rate but that it does not apply that rate to each of the seven classes. Upon one class it imposes a rate of one-fourth of one per cent. on its gross income or sales, upon four classes a rate of one per cent., and upon two

classes a rate of two per cent., as the enumeration given below will disclose.

Class (a), rate, one per cent.:

(1) Manufacturing, baling, crating, etc., for sale, profit or commercial use, agricultural and horticultural products, etc.

Class (b), rate, one per cent.:

(1) Transporting for hire persons or property by motor vehicle from one point to another in the state.

Class (c), rate, one per cent.:

(1) Mining, quarrying, smelting for sale, oil, gas, sand, copper, gold, silver, etc.

(2) Furnishing electricity, gas and water.

(3) Transmitting messages by telephone or telegraph in the state.

(4) Transporting for hire freight or passengers in the state.

(5) Operating a pipe line for carrying oil or gas in the state.

(6) Operating private car lines within the state.

(7) Publication of newspapers, magazines, etc.

(8) Job printing, engraving, embossing, etc.

Class (d), rate, two per cent.:

(1) "Selling any tangible personal property whatsoever at retail, except bonds and stock."

Class (e), rate, one per cent.:

(1) Restaurants, dining cars, lunch rooms, soda fountains, etc.

Class (f), rate, two per cent.:

(1) Conducting theatres, operas, shows, races, contests, dance halls, etc.

(2) Hotels, guest houses, resorts, parking lots, tourist camps, etc.

Class (g), rate, one-fourth of one per cent.:

(1) Compounding, packing, preserving and selling tangible personal property at wholesale.

It will be observed from a reading of these classes that the business of contracting is nowhere mentioned or referred to in them but the contention of appellants is that the construction company, which had built two steel bridges and their approaches on highway 60 under a contract with the state, should pay a sales tax of two per cent. on the consideration received therefor, $118,000.00, their theory being that in building the bridges and turning them over to the state it was, within the meaning of class (d), *supra,* engaged in the business of selling tangible personal property at retail. The trial court held adversely to this contention but upon appeal to this court that ruling was reversed by a well-stated opinion prepared by Justice ROSS and concurred in by me, Justice LOCKWOOD dissenting, 50 Ariz. 332, 72 Pac. (2d) 573. When this opinion was rendered, however, on October 9, 1937, I did not know that on June 11, 1937, the legislature had amended chapter 77, Session Laws of 1935, by adding to its section 2, article 2, a class of business not theretofore enumerated, reading as follows:

"(h) At an amount equal to one per cent. of the gross proceeds or gross income from the business, upon every person engaged or continuing in the business of contracting. Payments made by the contractor for labor employed in construction, improvements or repairs shall not be subject to the tax herein imposed." Chapter 2, Acts 1st Special Session, Thirteenth Legislature.

This provision was a part of the sales tax law when the case was argued before us on June 16th, but it had been such only three or four days and the acts of the legislature which passed it had not then been published, hence, it must be that the parties to the litigation were at that time unaware of its passage, for counsel for neither side called our attention to it. Had they done so, I would have treated it then,

as I do now, in so far as it concerns contractors, as a legislative construction of the language imposing a tax on those engaged in the business of selling tangible personal property at retail, because this is the natural and logical effect of the procedure used and the language employed to bring contractors expressly within the provisions of the sales tax law. If the Thirteenth Legislature had felt that contractors were, within the meaning of the act of 1935, engaged in the business of selling tangible personal property at retail but had decided that the rate of two per cent, on the contract price was too high and should be reduced, it seems plain that it would have brought this change about in the natural way, that is, by amending specifically the language imposing such a rate, subsection 1 of class (d), and not have left it to those whose duty it was to administer the law, and perhaps the courts, to decide whether, in so far as that provision applied to contractors, it had been repealed by implication. Instead of doing this, however, it treated contracting as a business separate and distinct from any other included within the terms of the act—not as one already within its provisions—placed it in a class by itself, and provided that those engaged in it should pay only one per cent. upon their gross income and that even this should not be imposed on the payments made for labor employed on the job.

The fact that the legislature, when it first imposed by express language a tax on those engaged in contracting, fixed such a low rate, one only about a third as high as that retailers of tangible personal property were required to pay, indicates, to my mind, that it thought it was bringing them within the provisions of the sales tax law for the first time, and not that it was lowering a rate already required of them, because one finds it difficult to believe that legislators, who in June, 1937, felt that a rate of around three-

fourths of one per cent. on the gross income of a business was proper, could ever have entertained the view or required that those following it should pay a rate of two per cent., or practically three times that much. To hold that the Twelfth Legislature did intend to impose such a rate on contractors and that the Thirteenth was merely amending it in that particular would mean that the later body reduced it sixty-five per cent., provided the payments for labor be figured at, say, thirty per cent. of the total cost, with the result that one constructing two bridges and their approaches for $118,000.00 would pay a tax of $826.00, instead of $2,360.00. It is unbelievable that contractors were ever required to pay a rate almost three times that demanded of those engaged in other businesses in which the labor cost is a big factor, for a close scrutiny of the latter discloses that the policy of the legislature from the start was to impose a low rate on those whose business called for heavy labor expenditures. While it is true that labor enters, to some extent, into every business enterprise, yet it was never the intention of the legislature that it should be treated as tangible personal property and a tax collected for the state on the payments made therefor.

It should not be overlooked that the first sales tax law in Arizona, which was enacted in June 1933, Acts Eleventh Legislature, First Special Session, chapter 17 (Revised Code Supplement 1934, article 15, page 344), and remained in effect for two years, imposed a tax of one and one-half per cent. on those engaged in the business of selling tangible personal property at retail and that, so far as the record discloses, no effort was made during this period to collect a tax on the income from contractors. The legislature was evidently satisfied with this construction of its language, for in the enactment of a second sales tax law two years later, or in June, 1935, it incorporated therein without

change, except that the rate was raised from one and a half to two per cent., the exact language of class (d), section 2, article 2 of the act of 1933, imposing a tax on the gross income of the business of selling tangible personal property at retail. The same interpretation was placed on this act by the tax commission for over a year after its passage, or until July 23, 1936, when it decided that contractors were subject to the tax as retailers of tangible personal property and ordered the director of the sales tax division to collect it from then on. When the Thirteenth Legislature, many of whose members had served in the Twelfth, met in May of this year in its first special session to revise the sales tax law, it evidently knew that a controversy as to the proper construction of that provision had arisen, that the trial court had decided the question, and that it had been brought to this court on appeal. Knowing these facts, it reenacted the exact language of class (d), section 2, article 2 of chapter 77 of the act of 1935, imposing a two per cent. tax on those engaged in selling tangible personal property at retail, and proceeded to provide specifically in a separate and distinct section that contractors should pay not two but one per cent. on their gross income, and that their payments for labor should be excluded from even this. I cannot regard such action by the legislature, in view of the facts then existing, otherwise than saying in effect that it was never intended that contractors should be treated as retailers of tangible personal property and that it was then, for the first time, placing them under the provisions of the sales tax law, and requiring them to pay what, in its judgment, was a proper rate. It evidently felt that the expression, ''the business of selling any tangible personal property whatsoever at retail,'' except as therein modified, had been used in the acts of 1933 and 1935 in the sense in which they are generally un-

derstood, so in chapter 2, First Special Session, 1937, it proceeded to use the exact language again in the same sense and to employ in addition the term, "the business of contracting," to convey the meaning it ordinarily carries, the purpose of the first being to continue the sales tax on a person engaged in the business of selling at retail and of the second to impose it for the first time on one engaged in the business of contracting. Each of them referred to an enterprise separate and distinct from that mentioned or intended by the other.

Hence, it seems clear that the incorporation of subsection (h), *supra,* in section 2, article 2 of the sales tax act of 1937 was intended as a legislative construction of the expression, "selling any tangible personal property whatsoever at retail, except bonds and stock," in so far as that language applied to those engaged in the business of contracting, and since the body that incorporated it in the law and may change, modify or eliminate it, has thus construed it, it is, as I see it, the duty of the court to accept that declaration of its meaning. It is a rule of statutory construction that where, in the enactment of a law, the legislature employs in a subsequent clause of the same act or in later legislation on the same subject language clarifying a doubtful expression theretofore used, the court should give that language the meaning the legislature intended. The principle was stated by Chief Justice MARSHALL many years ago in *Alexander* v. *Mayor etc. of Alexandria,* 5 Cranch, 1, 7, 3 L. Ed. 19, when he said:

"If in a subsequent clause of the same act provisions are introduced, which show the sense in which the legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases. Consequently, if a subsequent act on the same subject affords complete demonstration of the legislative sense

of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law."

In 25 R. C. L., p. 1064, § 288, is found the following language:

" . . . If it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute."

See, also, the following: *Board of Commrs. of Sweetwater County* v. *Bernardin,* (C. C. A.) 74 Fed. (2d) 809; *Fergus Motor Co.* v. *Sorenson,* 73 Mont. 122, 235 Pac. 422; *State* v. *Clausen,* 63 Wash. 535, 116 Pac. 7; *State* v. *Youngbluth et al.,* 60 Wash. 383, 111 Pac. 240; *Stephens County* v. *Hefner,* 118 Tex. 397, 16 S. W. (2d) 804; *American Laundry Machinery Co.* v. *Union Trust Co. of Rochester et al.,* 153 Misc. 55, 274 N. Y. Supp. 898.

In view of the foregoing, it is my opinion that the judgment of the trial court was correct and should be affirmed. It is so ordered.

LOCKWOOD, J., concurs.

ROSS, J., Dissenting.—I dissent, and in doing so I feel the question is such that I should give my reasons.

The Chief Justice has changed his mind as to the law governing in this case and gives as his principal reason for so doing the action of the Thirteenth Legislature, Laws 1937, First Special Session, chapter 2, in amending chapter 77 of the Laws of 1935, which he says was not known to him at the time or before our decision was handed down. He says, after enu-

merating the various causes relied upon by movent
for a rehearing:

"It may, perhaps, be true that the rule of contem-
poraneous practical construction should, as a result
of these facts, be applied, but since my view of the
matter in its present state rests upon a different prop-
osition, I shall not undertake to say definitely whether
it should be or not."

The decision in the case as originally presented to
the court turned upon which of two lines of reasoning
we should adopt. We adopted that line that held, un-
der excise statutes somewhat like ours, that a con-
tractor who builds permanent structures, such as
bridges and houses, for the owner of land upon which
such structures are placed, for a lump sum, sells the
material entering into such structure as tangible per-
sonal property to the owner, and that the owner be-
comes and is the final consumer. That was, and is,
the determinative question. In deciding this question,
I concede that contemporaneous construction by the
State Tax Commission, the body entrusted to admin-
ister the law, should be considered by the court, but
deny that mere inaction by the commission is any
construction whatever. The only construction of the
act by that body of which we have any knowledge is
that the act imposes a tax on contractors such as ap-
pellee. It is so alleged in the complaint. The rule
seems to be that a failure of the body whose duty it
is to enforce a law, especially a tax law, may not be
treated as a contemporaneous construction thereof.
In *City of Louisville* v. *Board of Education,* 154 Ky.
316, 157 S. W. 379, 380, it is said:

"The mere failure of public officers charged with a
public duty to enforce statutory and constitutional pro-
visions in respect to the levy and collection of taxes,
or the acquiescence of public officers in conditions that
exempted certain property from its fair share of the
burdens of taxation, should not be permitted to stand

in the way of the correct administration of the law, or be construed to estop more diligent and efficient public officers when they attempt to perform their duty by bringing in to the revenue proper subjects of taxation that had theretofore been allowed to escape the payment of taxes.''

In *Bank of Hawaii* v. *Wilder,* (C. C. A.) 8 Fed. (2d) 845, 847, *certiorari* to Supreme Court denied (270 U. S. 652, 46 Sup. Ct. 351, 70 L. Ed. 781), it was said:

''Finally, there is the argument that the construction adopted for some years by territorial treasurers and executive officers, and not changed by legislation evincing dissent, justifies the interpretation contended for by the bank. Let it be that, if such construction of exemption had been uniform and continuous, resort to long-standing executive practice might be almost persuasive. But, where there have been differing constructions and lack of uniformity, the construction put upon the statute by the territorial Supreme Court should have very great weight. Omission of the taxing officers to assess and tax property did not lessen the duty put upon their successors, or take from the courts the power of construction of the law under which the exemption was claimed.''

If this court's ideas of the law are to be influenced at all by executive construction of the sales tax law, why not yield to the construction of the law given by the Tax Commission, to the effect that appellee and others engaged as it was were subject to the tax. The commission's is the only affirmative contemporaneous construction we have.

Under such construction the Chief Justice suggests the appellee would have to pay 2 per cent. on the contract price of $118,000, or $2,360. But that should be no hardship on the appellee, for it knew that it would be expected to make such payment when it took the contract. The trial court found that the Tax Commission's construction had been given publicity at that time. Appellee could have taken care of the taxes, and

probably did in its price. By rejecting the commission's construction of the law, appellee and other contractors of the state, like the processors under the Agricultural Adjustment Act, 48 Stat. 31, 7 U. S. C. A., § 601 et seq., are or may be the recipients of considerable bounties running into thousands of dollars.

The Chief Justice seems to base his present conclusion upon the intention of the Thirteenth Legislature and not the intention of the Twelfth, the one that passed the excise Revenue Act of 1935 (chap. 77). It is elementary that the intention of the legislature should control, but we should never mistake the legislature whose intention is to control. As is said in *Reed* v. *Huston,* 24 Idaho 26, 132 Pac. 109, 111, Ann. Cas. 1915A 1237:

"The legislative intent that controls in the construction of statutes has reference to the Legislature which passed a given act, and that intent is indicated by the action of the Legislature, and not by their failure to act."

So, it is the intention of the Twelfth Legislature that we are particularly interested in and not that of the Thirteenth. After chapter 77 had been in effect for two years, it was amended by the subsequent legislature by redefining its words and phrases, adding new definitions, changing some of the rates, and reclassifying some of the articles to be taxed. Chapter 2, 1st Sp. Sess., 1937. The fact that the Thirteenth Legislature changed the rate, or reclassified an article, does not mean that the Twelfth Legislature did not have the intention to place the article in the classification given it or to impose the rate stated. It means simply that the subsequent legislature, in the respects mentioned, thought there should be changes made and consequently made them. These changes did not reflect the intention of the Twelfth Legislature but only the intention of the Thirteenth.

The fact that the Thirteenth Legislature took contractors out of a general class and placed them in a specific class, and changed the rate of the tax, may be some evidence that its members were aware that contractors were contending that they should pay no tax under chapter 77, whereas the Tax Commission was contending that they fell within article 2, section 2, subsection (d), and should pay a tax. By no stretch of the imagination is it any evidence that the Thirteenth Legislature thought or believed contractors were not taxable under such chapter. Placing them in a class to themselves and fixing a lower rate and exempting the amount paid for labor does not show that the legislature believed that contractors were not already being taxed. The last legislature said, in effect, if perchance the Twelfth Legislature did not tax contractors, we will now do it. In other words, it recognized that not to tax them was an unjust favoritism. If chapter 77 had been construed by the Tax Commission in a certain way for a considerable length of time, and if the legislature had re-enacted it or revised it, with knowledge of such construction, without any change, then the principle of contemporaneous construction might well apply. For this court to say that, because the Thirteenth Legislature amended and changed chapter 77, it construed it never to have intended contractors should pay taxes on the tangible material put into a bridge or house, and that we are bound by such construction, is dodging our duty to construe the laws and relegating it to a body authorized to make laws but not to construe them. Apropos of this thought, we quote from *Cutrona* v. *Mayor and Council of Wilmington,* 14 Del. Ch. 434, 127 Atl. 421, 426, as follows:

"In *Jones* v. *Wootten,* 1 Har. 77, in discussing this question, the Court said:

" 'If that act is to be considered as an act declaratory of what the law was before its passage, it cannot as such have any weight with the court. Each department of our government must operate and be confined within its constitutional limits. The power that makes, is not the power to construe a law. The Legisture may declare what the law shall be, but not what it is or has been. That power belongs to the judicial department alone, and they in discharging their duty are to form their own opinion, and are not to be the mere organ of the Legislature and declare its opinion of what the law is or has been. This proposition is one so clear that the Supreme Court of the United States, in the case of *Ogden* v. *Blackledge,* 2 Cranch, 272 [2 L. Ed. 276], declined hearing an argument in its support, and stopped the counsel who was about to sustain it.' ''

The quotation from *Alexander* v. *Mayor etc. of Alexandria,* 5 Cranch, 1, 7, 3 L. Ed. 19, found in the opinion of the Chief Justice, is unquestionably an expression of a good rule of construction when applied to a suitable state of facts. The Supreme Court was there considering this kind of a situation: In 1779 the Virginia legislature provided that the town of Alexandria could "assess the inhabitants for the charge of repairing the streets and highways." It was contended by an owner of land located in Alexandria, but who was not an inhabitant, that he was not taxable under such act. It appeared, however, that a later act (of 1796) provided that the town could recover taxes for street paving against nonresidents of the town holding lands therein. The court said: "Without deciding this question as depending merely on the original law, it is to be observed that acts *in pari materia* are to be construed together as forming one act," and then stated the rule of construction quoted. If the question here were whether contractors should be taxed after the amendment of chapter 77, the rule quoted would have application for the "subsequent

act [amending act] on the same subject affords complete demonstration of the legislative sense of its own language." But the question is not whether contractors may now be taxed but whether chapter 77 by its provisions, directly or indirectly, taxed them—whether the general provision levying a tax on all persons selling at retail tangible personal property for consumption is broad enough to include contractors such as appellee. We held in the original opinion that the line of cases sustaining such a tax, under similar acts, announced the sounder rule, and a rule that acquitted the legislature of favoritism to builders and contractors, and I am still of that opinion.

In reaching my conclusion, I have preferred to look for reasons to include contractors as taxable rather than reasons to exclude them, and I place paramount reliance upon the conviction that the legislature did not intend to tax people upon their purchases of food, clothing, and medicine and exempt contractors from paying taxes upon the building material entering into structures built by them under contract for a lump sum.